1. The description of the six acres of land sought to be recovered, as part of 250 acres claimed by the plaintiffs and fully described in their ejectment suit, was not too indefinite to support a judgment in their favor since, even though the description of the six acres was indefinite, the sheriff could nevertheless put them in possession of any part of the 250 acres found to be in the possession of the defendant.
2. Since evidence of prior possession alone was sufficient to put the defendant on proof that he had a better title than that of the plaintiffs, where the latter, after attaching an abstract of title as a part of their petition, offered in evidence only the last deed conveying the land to their father, a verdict finding for them was not contrary to law, as contended, because they had not proved each and every item or link in their abstract of title.
3. The evidence was sufficient to authorize the jury to find that the six acres in dispute were included in the 250-acre tract owned by the plaintiffs.
4. There is no merit in the contention of the defendant that the plaintiffs were not entitled to recover because the deed which they relied on conveyed the land to their father as an individual and not as guardian.
5. The evidence, though conflicting, authorized the jury to find that neither the defendant nor his predecessor had acquired title by adverse possession.
6. The evidence supported the verdict.
 No. 15223. SEPTEMBER 8, 1945.
This was a suit to recover land, brought by Mrs. Clara Russell (formerly Clara Gosa), John Leonard Gosa, and Clarence Gosa, against W. D. Crews, a resident of Brantley County, Georgia, alleged to be in possession thereof and described in the petition as follows: "Six acres, more or less, in the northeast corner of original land lot 199, 9th land district of Brantley County, and bounded north by original lot line; east by original lot line between lot 199 and 216; south by thin run of branch and lands of petitioners; west by lands of your petitioners, being practically a square;" that said land is situate in a 250-acre tract owned by the plaintiffs. Attached to the petition was an abstract of title, showing twenty successive conveyances, the first twelve of which were conveyances of 490 acres, the entire land lot 199, and the next seven were conveyance of only 250 acres of lot 199. These seven conveyances described the lands conveyed as follows: "Two hundred and fifty acres, more or less, of land lot number 199, 9th land district, *Page 733 
of Pierce County, Georgia, being all of said lot that lies east of the run of Tanny's Branch, except a parcel of 20 acres, more or less, about the center of the east line of said lot owned by W. J. Medlin, bounded north by lands of Manning Griffin; east by lands of Andrew Hale; and east by lands of N.W. Martin and W. J. Medlin; south by lands of Lydia Norman; west by run of Tanny's Branch and lands of M. Shuman, George Lee, and Stephen Lee." The 19th conveyance, last above listed, was by W. J. Martin to J. D. Skinner, dated November 25, 1914, and recorded the same day. The 20th and last conveyance was by J. D. Skinner to John F. Gosa, guardian of Clarence, Clara, and John Leonard Gosa, dated January 6, 1916, recorded two days later, in which the lands conveyed were described as follows: "Being two hundred and fifty (250) acres, more or less, in land lot No. 199, in the 9th land district, bounded as follows: north by the original land lot lines, and lands of Manning Griffin; on the east by the original land lot lines and in part by the lands of T. J. Medlin; on the south by the original land lot lines and the lands of Mrs. Lydia Norman; on the west by the run of Tanny's Branch, and the lands of M. Shuman, George Lee, and Stephen Lee." This last stated deed was introduced in evidence by the plaintiffs.
The plaintiffs, now more than 21 years of age and sui juris, are the same persons named in said last-mentioned deed by Skinner to John F. Gosa, guardian. It was agreed by all the parties that the lands conveyed were formerly in Pierce County but are now in Brantley County.
The defendant answered but did not demur to the petition. In his answer he claimed that he and those under whom he claims have been for more than thirty years in continuous, exclusive, uninterrupted, and peaceable possession of the lands described in the petition; their possession being public, actual, and notorious, consisting of the cultivation of the lands and the working of the timber situated thereon. The defendant attached to his answer "an abstract of title, marked Exhibit `A,' under which he relies for title to the lands described in plaintiffs' petition." This abstract showed a conveyance by N.W. Martin to Andrew Hale, dated October 31, 1885, recorded March 26, 1907, of "a certain parcel of land situated in the county aforesaid, to wit, the northwest corner bounded west by a creek, south by a small branch, east by *Page 734 
an old road, north by the line running east and west, containing twenty acres more or less of lot 216;" and a conveyance by A. J. Hale to W. D. Crews, dated February 24, 1936, containing "forty acres, more or less, of lots of land numbers 199 and 216 in the 9th land district of Brantley County, Georgia, and bounded as follows: north by original land lot line; east by road; south by branch; and west by Big Creek." This last-mentioned deed was introduced in evidence by the defendant. According to the defendant's abstract, the deed into Andrew Hale was dated October 31, 1885, and the deed from A. J. Hale to the defendant was dated February 24, 1936. The conveyance by N.W. Martin to Andrew Hale showed no conveyance of any part of lot 199.
The defendant also claimed title by prescription, having taken the deed from A. J. Hale in February, 1936.
Mrs. Russell, one of the plaintiffs, testified in part: "I found Mr. Crews in possession of some of our lands. He had put up a fence that had been taken down, and I found that the timber had been cut. He was in possession of about six acres which was under fence, but there was no house on the back either. Mr. Crews stopped Mr. Page, the surveyor, and me, prior to the time the suit was brought, told us we couldn't go across; he said it was his, and he said he had been there, and that he didn't want us to go across his land. I asked the surveyor if he could follow the line. He said, `No, Mr. Crews asked me to stop; I will stop.' According to my deeds that land under fence belongs to me and my brothers. It was at that time I first found out that Mr. Crews had gone into possession of that land belonging to us. I did not discover it until the line was being run. I remember when my father bought the land. Mr. Hale was not in possession of the land at that time. There had been a field there. The turpentine trees were not being worked and had not, to my knowledge, been worked in 1916. The timber had been leased and the timber had been sold, and the people that owned the acres I now claim had sold it to a sawmill, as I understand it. I wouldn't be positive that Mr. Varn worked it under us, because I didn't live here, can't go down and see, and depend on the other fellow, but he bought the lease which we signed. I did not know where the northern boundary was. My deed says the original land lot line. I don't have the lease and I don't know what it says. Mr. Hale came to my father and said *Page 735 
he didn't have any firewood, and the people there were angry with him, and he didn't have any place to get any wood; and my father said, `Mr. Hale, you are welcome to get your firewood off of my place.' I suppose Mr. Hale continued to live there until about the time of his death. Our lands are in land lot 199. This land which we are seeking to recover corners right in the corner of this land lot. We moved off of our place down here in November or December, 1920. We were in possession when we lived there. As to what acts of possession we had over this property — we had our deeds that we owned the land. As to whether we went in there and cut any boxes or put up any cups — we leased it; if the fellow didn't box it, we didn't know because we didn't live there; I understood Mr. Varn worked the boxes, but I can not speak for him. They were worked, to the best of my knowledge, by Mr. Varn. I know the trees were worked on this particular part that is in controversy, supposed to be by Mr. Varn or whoever pulled the trees for him."
Mr. Page, the county surveyor, testified for the plaintiffs: "We didn't have any trouble from the southwest corner of 216 and 199. We started at that corner and ran all the way through until we came to a branch. Mr. Crews came to us a pretty good while before we got to the branch, and he told me that his land came down to the branch. In order for Mr. Crews to claim this, if he had any land on this lot, it would have to be on lot 199 and could not be on lot 216, as this (indicating) is the lot line between those lots. The Russell land is all in 199. As to about how many acres Mr. Crews had of the Russell land under fence — I think there is five or six acres that's fenced in. Mr. Crews said he bought the land in 199, and he said that that was his. When I ran that line up there where I said Mr. Crews was, I found that there was a part of the land on lot 199 under fence. As to whether there were some turpentine cups on it — the turpentine cups are farther back south from there. There's a branch that runs off from the lot line, starts like a little drain, and runs off into a branch, and goes off in that direction (indicating) from the lot line, and another little drain goes to the field and runs into that. The turpentine cups in question are on 199 between the branch and the lot line. This plat which I, as county surveyor, made is correct so far as I made it. *Page 736 
It is my original plat and conforms with that deed. We ran the lot line."
Owen Ammons testified for the plaintiffs: "I have lived out there near this Russell property a little better than 40 years and am familiar with the six acres, more or less, that Mr. Crews is claiming, and I know where the land lot line is between 216 and 199. That over here where Mr. Crews is claiming is on 199. I have known the land lot line for about 20 years or longer. In answer to your question as to who has been in possession since 1916 of the land which Mr. Crews is claiming — the first I knew about it Mr. Hale was over there. I went over there to visit him a lot, and in going over his field he showed me where the line was over there; since then I have been back there and have known where the line was. As to whether Mr. Hale claimed it over there where Mr. Crews claims it — he never did tell me he owned that back there. As to whether he was in possession of this six acres Mr. Crews is claiming it had been cultivated there in time, but at the time we was there he was only cultivating a piece from the house back there, but he had some tobacco beds cleared up over there. The tobacco beds were on lot 199, but he didn't tell me he owned it."
James Lee testified for the defendant: "I know where Mr. Andrew Hale used to live. It was about a quarter of a mile from our house to his. The place on which I was reared and the Hale place joined. I remember a field that Mr. Hale had in cultivation and that was his home. I couldn't say just what year I first remember that field, but it was there as far back as I can remember and I was born in 1895. I reckon it was 1916 when I left the old place there, and as well as I remember Mr. Hale was still cultivating the land at that time. . . I don't know that I could say positively what land lot Mr. Hale's land was in, but he owned some land in two different lots. I don't remember the numbers of the lots, but he must have owned some in 199, as the field I am talking about was in the two land lots. I know because there were original lines across the field. I don't know how many acres he came across the line, and I did not know that Gosa came down there and took possession of this land of 250 acres, including the field. Mr. Hale kept the place in his possession after I left there. *Page 737 
Gosa's 250 acres are south of the Hale property, but I don't know where the lines are and wouldn't swear to them at all."
Owen Lee testified for the defendant: "The place on which I was raised adjoins Mr. Andrew Hale's place. I remember that Mr. Hale had a field there at this place as far back as I can remember. Part of that field was in land lot 216 and part in land lot 199. As to whether I would swear Mr. Gosa never took possession of that field — well, they worked the timber up to where he claimed the line and turned back. If they took over this six acres over there in lot 199, I didn't know anything about it. The Gosas worked the timber up to the Hale line. I worked the timber for the fellow that leased it. We worked up to the line that he claimed on the south and quit. That was on lot 199, and Mr. Hale went back to the creek." Being recalled, Owen Lee testified: "I testified a while ago that I worked the timber on the Gosa tract up to the Hale line. I was working that for K. S. Varn Company, of Hoboken. That was in 1929 or `30. That, the Hale line, was where I was instructed to work it to. Mr. Varn didn't put up any cups or work any cups on the part Mr. Hale claimed. He just went to this line on the south."
The defendant testified: "I purchased this tract of land from Mr. Hale in 1936. As to how soon it was after I purchased this tract I went into possession — I let Mr. Hale stay there, and he lived there a year after I bought it. He was on the farm and he kept that. I worked part on the piece of land, but Mr. Hale worked the farm that first year. As soon as I bought it, I went to work on the timber on it. Mr. Hale worked it under me, but after 1936 was over he moved off of it and I rented it to Ben Guy and have been in possession ever since. The farm there has been cultivated every year, and I have worked the turpentine timber every year since I bought it. I haven't worked it all myself, but I have worked it and had it worked. I bought it in February, 1936, and have worked the timber and the lands have been cultivated under me since that time. As to whether I knew that Mr. Hale had a deed to only 20 acres of lot 216 — he had a deed to 20 acres, more or less, I didn't know whether there was 40 or 10 — bounded by the creek on the west. I bought this land knowing that Mr. Hale had a deed to just 20 acres, bounded by the creek. I do not know where all the Gosa land is, but I did stop Mr. Page *Page 738 
from finishing the survey out there in August. I had a good right to stop him because I bought the land in lot 199 from Mr. Hale. I think he owned it when he sold it to me. The deed didn't call for land on lot 199, but it did call for land to the creek. At the time I stopped Mr. Page it was from going across the field. They had given me no notice that they were going to run a land line. I just happened down there and found them in there. I did not know Mr. Page at that time, never having seen him before as I remember. Mr. Hale lived on the farm in 1936 after I bought it, but I worked the timber on the land in that year. I moved Ben Guy on the farm in 1937."
In addition to the above testimony, the record shows that John F. Gosa, the father of the plaintiffs, died in 1936, but the evidence is not clear as to whether he died in possession of the 250 acre tract or whether he removed therefrom in 1920 along with the plaintiffs. Mrs. Clara Russell, on being recalled, testified: "My father attended to those things [referring to the turpentine lease] when he lived, and when we moved away we didn't have anything to worry about."
The jury returned a verdict for the plaintiffs. The defendant made a motion for new trial on the general grounds, which was overruled, and he excepted.
1. This is a statutory suit to recover six acres of land. The attorneys for the plaintiff in error insist that the description under which the plaintiffs sought to recover was too indefinite, and that under the principle announced inHuntress v. Portwood, 116 Ga. 351 (3) (42 S.E. 513), andPaulk v. Perry, 44 Ga. App. 131 (160 S.E. 681), a valid verdict and judgment could not be rendered thereon. Reference to the foregoing statement of facts will disclose that the petition, together with the abstract of title which was duly made a part thereof, fully and completely describes the 250 acres of land claimed to be owned by the plaintiffs, and alleges that the six acres sought to be recovered "are situate in the 250-acre tract." In these circumstances, the sheriff would have no trouble in executing a writ of possession for the reason that he could put the plaintiffs in possession of any part of the 250 acres found to be in the possession of the defendant. Buffington v.Carter, 199 Ga. 811 (2) (35 S.E.2d 440). *Page 739 
2. It is insisted that, since the plaintiffs made their abstract of title a part of their petition, it was necessary for them to prove each and every item or link in the abstract, and that, since they introduced only one deed, being the last conveyance referred to in the abstract, they did not make a case which authorized a recovery, because they failed to prove an essential and material allegation of their petition.
There is no merit in this contention. The evidence shows that the plaintiffs were in possession of the 250-acre tract prior to and until November or December, 1920, and that the defendant did not receive the deed under which he claimed the six acres until February 24, 1936.
Evidence of prior possession alone is sufficient to put the defendant on proof that he has a better title than that of the plaintiff. Code, § 33-102; Moss v. Chappell, 126 Ga. 196
(3) (54 S.E. 968, 11 L.R.A. (N.S.) 398); Jackson v.Strickland, 127 Ga. 106 (2) (56 S.E. 107); Mays v.Redman, 134 Ga. 870 (68 S.E. 738); Terrell v. Gould,168 Ga. 607 (2) (148 S.E. 515).
3. It is also insisted that the description in the deed from John D. Skinner to John F. Gosa, guardian of the plaintiffs, does not necessarily include the six acres sued for, in the northeast corner of land lot 199.
The plaintiff in error does not contend that the description of the 250-acre tract described in the above deed, which was introduced in evidence, was too indefinite to constitute a valid conveyance, but contends merely that it does not necessarily include the six acres sued for.
The plaintiffs alleged that the six acres were situated in land lot 199 in the 250-acre tract owned by them. Mrs. Clara Russell testified that she found the defendant in possession of about six acres of land, which according to the deed relied upon belonged to them. The surveyor testified that the five or six acres were on land lot 199 and not on land lot 216.
The above evidence was sufficient to authorize the jury to find that the six acres in dispute were included in the 250-acre tract of land owned by the plaintiffs.
4. Another insistence is that the plaintiffs were not entitled to recover because the only deed introduced was to their father, *Page 740 
John F. Gosa, as an individual, the words "guardian of Clarence, Clara, and John Leonard Gosa," being simply description personae. Reasons urged in support of this contention are: 1. The deed recites that the conveyance was made to "said party of the second part, his heirs and assigns," and recites that as a part of the consideration the "party of the second part assumes a loan of $800," etc., and in the habendum and tenendum clause uses the language "to the only proper use . . of him the said party of the second part, his heirs and assigns. 2. There is nothing in the evidence to show that John F. Gosa was in fact the guardian of the plaintiffs. (3) The plaintiffs relied on being sole heirs of their deceased father, rather than on being beneficiaries in a deed made to their guardian; and since that position, taken before the case was submitted to the jury, was inconsistent with a position that they brought the suit as beneficiaries of a guardianship, they are estopped to claim in any other manner than as heirs at law; (4) The plaintiffs relying as they did on being the sole heirs at law of John F. Gosa, it was necessary under the Code, §§ 113-901, 113-907, to show either that there was no administration of the estate of John F. Gosa, deceased, or that, if there was such administration, the administrator consented to their bringing the action.
The above contention is without merit. It does not appear from the record that any objection was made during the trial or that any question was raised as to whether the plaintiffs were seeking to recover as wards, as alleged in their petition, or whether before the case was submitted to the jury they relied on being sole heirs of their deceased father. On the other hand, the record shows that John F. Gosa, the father and natural guardian of the plaintiffs, died in 1936; also, that the 250 acres of land claimed by them belonged in fee simple to them, his former wards, who have attained their majority and are sui juris.
In the circumstances, it is too late to insist for the first time in the brief of the plaintiff in error that the plaintiffs could not recover because the evidence failed to show either that there was no administration on the estate of John F. Gosa, deceased, or that, if there was such administration, the administrator consented to their bringing the action.
5. Finally, it is insisted that the defendant purchased the land in question from Andrew Hale on February 24, 1936, while the *Page 741 
petition was not filed until August 12, 1943, more than seven years later, and that the defendant's evidence made an undisputed and unchallenged showing of title by prescription in him for more than seven years, and disclosed that Andrew Hale, the defendant's predecessor in title, was in actual possession for more than 20 years.
There being some evidence for the plaintiffs to the effect that the possession of Andrew Hale was permissive, the jury were authorized to find that he had not acquired title by prescription. The defendant testified that he knew Andrew Hale had a deed to only 20 acres, more or less, in land lot 216, bounded on the west by "a creek," but that he did not know whether there were 40 acres or 10. Furthermore, there was some evidence, though conflicting, that a lessee of the plaintiffs, after they had removed from the land in 1920, worked the 250 acres for turpentine purposes. While, as above indicated, the evidence shows that the father of the plaintiffs died in 1936, the year that the defendant took a deed from Andrew Hale, there is no evidence showing that their father left the land along with the plaintiffs in 1920. On this question, Mrs. Clara Russell testified: "My father attended to those things [referring to the turpentine lease] when he lived, and when we moved away we didn't have anything to worry about." The evidence is silent as to the month and day that John F. Gosa died. If he had lived and remained in possession until after August 12, 1936, seven years would not have elapsed between that date and August 12, 1943, when the petition was filed.
In the circumstances, the jury were authorized to find that the defendant knew that his predecessor. Andrew Hale, owned only 20 acres in land lot 216; and that the defendant did not claim in good faith, under his possession, any right to additional land in the adjoining land lot, and therefore did not acquire the six acres in land lot 199 by seven-years' adverse possession. CompareWatkins v. Nugen, 118 Ga. 375 (3) (45 S.E. 260).
Nor is a different result required because of the language in the deed from N.W. Martin to Andrew Hale, the defendant's predecessor in title, which described the 20 acres more or less in land lot 216 as being bounded "west by a creek." The above description does not give the name of the creek on the west, or state what distance it was from the east side of the 20 acres being *Page 742 
conveyed in land lot 216. It should also be noted that the description in the deed conveying 20 acres in land lot 216 to the defendant's predecessor described the land as being bounded on the west by "a creek," while the deed conveying to the defendant the 40 acres in land lots 119 and 216 described the land as being bounded on the west by "Big Creek." The surveyor testified: "There's a branch that runs off from the lot line, starts like a little drain, and runs off into a branch and goes off . . from the lot line, and another little drain goes to the field." Did the language, "a creek," as set forth in the first deed to the defendant's predecessor, refer to the small drain that ran off from the lot line or to the branch mentioned by the surveyor, or to the "Big Creek," referred to in the second deed, or to some creek or branch not mentioned in the evidence? In other words, was the creek referred to in the deed conveying 20 acres the same as the "Big Creek" referred to in the deed conveying 40 acres to the defendant? In the absence of any testimony on this question, coupled with the statement of the defendant that he knew his predecessor had a deed to only 20 acres in land lot 216, this court can not hold as a matter of law that the first deed actually conveyed 40 acres in land lots 199 and 216, instead of, as stated in the deed, 20 acres in land lot 216. To hold otherwise than we do, what would prevent the defendant in turn, from conveying 80 acres more or less in land lots 199, 216, and adjoining lots, and the defendant's grantee from conveying 160 acres more or less and so on, all springing from the deed conveying the 20 acres to the defendant's predecessor?
Nor can this court hold, as contended it should, that the jury were precluded as a matter of law from finding that the defendant knew his predecessor had title to only 20 acres in land lot 216, and consequently were precluded from finding that the defendant did not acquire title by prescription to the additional six acres in land lot 199.
In the above circumstances the evidence did not demand a finding by the jury in favor of the defendant.
6. The evidence supported the verdict for the plaintiffs, and the court did not err in overruling the defendant's motion for new trial.
Judgment affirmed. All the Justices concur. *Page 743