## A05A2086. McDILDA v. NORMAN W. FRIES, INC.
### (628 SE2d 195)

ADAMS, Judge.

Norman W. Fries, Inc., d/b/a Claxton Poultry Farms ("Fries") filed a declaratory judgment action in the Superior Court of Evans County to seek judicial determination of the common boundary line between its property and the property of the adjacent landowner, John A. McDilda. McDilda appeals the trial court's determination of that line which resulted in Fries obtaining approximately 100 acres that McDilda had claimed.

On appeal, a trial court's factual findings in a bench trial must be deferred to when supported by any evidence. See *Kimbrell v. Effingham Bd. of Tax Assessors*, 191 Ga. App. 544, 546 (382 SE2d 388) (1989). A trial court's legal conclusions are subject to de novo review. See *Suarez v. Halbert*, 246 Ga. App. 822, 824 (1) (543 SE2d 733) (2000).

So considered, the underlying dispute concerns the exact location of "the edge of the Canoochee River swamp" which forms the common boundary line between two adjoining tracts, the so-called Foy tract belonging to Fries and the so-called Freeman tract owned by McDilda. During a bench trial, Fries and McDilda offered conflicting evidence as to the correct location of that line. McDilda claimed that the edge of the river swamp was the line marked in 1969 by surveyor Joe Davis, for Georgia-Pacific Corporation ("GP") which owned the Foy tract at that time. Fries, on the other hand, claimed that the boundary was the line marked for GP by Jack Snelling, a registered surveyor and forester, when GP acquired the Foy tract in 1966.

Fries obtained the Foy tract when the property was sold at auction in October 1999. The area at issue appears on a plat showing a part of the Foy tract that is south and east of the Kennedy Bridge paved road. At Fries's behest, in November 1999, Timothy W. Eason prepared a survey of the property and his plat was recorded. Fries presented evidence identifying the boundary as a line first marked with white paint and blazed trees by Snelling who marked the line after GP acquired the Foy tract in 1966. David Borem, who managed the Foy tract for GP, testified that the line had already been marked in white paint before he became GP's forest manager for the Foy tract in 1972. Borem testified that at his direction, the color of the line was changed to blue so it would be easier to identify. Borem explained that:

> when I had it marked in the late seventies, . . . we marked it in blue paint, putting three bands on the trees within three feet of the exact line. Within three feet, we put three bands facing the other property line, and we put two bands on the

trees facing our property line that were on the adjoining land owner. But all within a six foot wide, maximum width. And those trees that were exactly, what we felt were exactly on the line, we painted with one band.

Borem supervised the marking by the workers and recalled that "I walked the line with them." Borem also testified that "[w]e never painted a line unless we got agreement from the adjoining owner. The fellows, my fellows, went to the adjoining owner, whoever it was along here, and said let's walk this line and this is the way it is."

When shown the composite plat by Eason, Borem confirmed that it virtually followed his blue line aerial photograph. In his opinion, the common boundary line designated by Eason on the plat corresponded with where GP had marked the line, first in white paint then in blue paint.

When GP sold the property in October 1987 to Allen Paulsen, GP reserved a right for 18 months to cut all merchantable timber and trees including stump wood. After the sale, a GP employee, James F. Palmer III, was responsible for supervising the cutting of the timber on the Foy tract. Concerned about the location of the property line and told that the line was marked, Palmer walked to the edge of the swamp and using his compass and running a 90 degree shot to the line, Palmer walked the line to make certain that the logger was cutting behind the line. Palmer testified that GP did not have all of the timber cut up to the blue line because some of it was small in diameter and not merchantable. GP had a logger cut the pine on "three islands in the swamp, pine islands" that were on "kind of high land."

Andrew Claxton, another former GP employee, was also familiar with the Foy tract. Claxton was involved with logger supervision and re-inventory cruising on the Foy tract. He recalled the line being marked by blue-painted trees. By checking the distances on an aerial photograph, "doing my compass and pacing," and cruising, Claxton ran his lines to the hill and back. Claxton testified that he particularly remembered this tract because of its topography and because "I was impressed with the high sand ridge." Claxton testified that the GP line was visibly marked and that the Joe Davis line was not the GP line as he knew it.

Eason, a registered licensed surveyor and the Evans County elected surveyor, testified that shortly after Paulsen purchased the Foy tract from GP, the farm manager had contacted him "to come find the line." According to Eason, even before Paulsen bought the GP tract, the blue painted line was recognized as the boundary line. Eason recalled on the hillside seeing a "marked and painted line along the edge of the swamp." He testified that the edge of the river

swamp had a painted line in blue. When shown GP's map, Eason agreed that the GP line was a virtual match with his own surveyed line. Eason testified that he had not seen any evidence on the ground of the Joe Davis line. Eason also testified that in swampy areas it is not unusual for the actual acreage as determined by an accurate survey to vary significantly from the "more or less" acreage that appears in old deeds. He added, "[r]egardless of the acreage, the line is the same." Eason explained that nobody knew how many acres were in the Foy tract because the property had never been surveyed prior to his survey.

To prove that the common boundary line was located further to the west than Fries claimed, McDilda relied heavily on a 2003 survey by Joe Davis, various legal descriptions in documents, and the topography at the edge of the swamp. Citing the number of acres depicted on various plats and recitals in deeds in the chains of title for both tracts, McDilda claimed that the Freeman tract was approximately 100 acres larger than Fries alleged and that the Foy tract was approximately 100 acres less than Fries claimed. The legal descriptions, however, described the acreage by using the phrase "more or less" or by using the symbol "+/-."

McDilda also submitted in evidence a videotape depicting the location of the boundary line that he claimed. The videotape was filmed by his son, Shane McDilda, as his son walked and operated a four-wheeler on what McDilda claimed to be the south edge of the river swamp. At various sites recorded on the videotape, Shane McDilda pointed out the topography of the ridgeline, sand hills, gopher holes, changes in the terrain and elevation, areas "holding water," two ponds, and even a sand mine. McDilda argued that the higher land, 30 to 50 feet up a sand hill was not river swamp and that the edge of the swamp should be a wet area.

After the presentation of the courtroom evidence, the trial court, by mutual agreement between the parties, conducted a view and walked the land accompanied by the parties and their counsel. During the view, each party pointed out to the court the physical location that each claimed was the boundary line between their adjoining tracts.

In a lengthy order, the trial court explained how it had determined the location of the boundary line. Finding no evidence that the 1972 blue-marked GP line had ever been moved, the trial court noted the testimony that the 1972 blue-marked GP line was visible to GP's former personnel from the date it was marked until the Foy tract was sold to Paulsen in 1987, and was visible to Allen Randall and Eason in 1986 before GP sold the Foy tract to Paulsen. The court further noted that the GP blue-marked line "was still easily visible during the view after the trial." The trial court noted that "[b]lue marks and old

blazes on trees conforming to the standard to which David Borem testified and a metal Georgia-Pacific boundary sign that had grown into one of the blue-marked trees to which it had been nailed, while not recent, were easily visible along the line to which [Fries] pointed during the view." The court summarized its observations as follows:

> During the view it was also readily apparent that the elevation changes and existing blue marks and old blazes of the GP line, which extend along the entire boundary as alleged by [Fries], coincide with the placement of the line and the topographical marks on the GP map prepared from an aerial photograph as explained by David Borem, Francis Palmer and Andy Claxton. Therefore, the blue-marked line seen during the view is found to be the GP blue-marked line that is depicted on the GP map, the 1999 plat prepared by Tim Eason, and the 1986 and 2003 plats prepared by Joe Davis.

The trial court concluded, "[a]ccordingly, having never been moved since it became the line by acquiescence not later than 1979, as a matter of law, that line, which is the same line that is shown as the boundary line on the 1999 plat made for [Fries] by Tim Eason, is hereby declared to be the common boundary line between the Foy tract and the Freeman tract today."

1. McDilda contends that the trial court erred in finding that the boundary line between his land and Fries's land was the metes and bounds line depicted for the first time on a plat of November 22, 1999, when Fries acquired the land and not the ancient natural landmark boundary described in recorded deeds.

As a general rule, the legal descriptions appearing in deeds in a chain of title are admissible "as bearing *upon the question of the identity and location of the boundary between the coterminous owners*," provided that the descriptions are not too vague and indefinite to indicate the location of the boundary. (Emphasis in original.) *Boatright v. Tyre*, 112 Ga. App. 179, 181 (144 SE2d 471) (1965). "Where the descriptive terms of a deed are clear and unambiguous, the court will construe the terms, and parol evidence is not admissible to control the legal effect of such a description." (Citation and punctuation omitted.) Id. at 182, n. 1.

McDilda's argument overlooks the fact that the legal descriptions in the deeds or plats entered in evidence here recite the boundary as the edge of the river swamp and, more significantly, contain the limiting language "more or less" or "+/-." Borem testified that the edge of a swamp is a somewhat ambiguous term that is "primarily designated by the timber type, the types of trees and

timber that's growing there." According to Borem, land 30 feet up a sand hill could still be river swamp.

As the trial court found, the limiting language of "more or less" has no legal value with respect to determining the exact number of acres in McDilda's tract since such descriptions have no legal value without reference points or other descriptive terms. See *Bennett v. Rewis*, 212 Ga. 800, 802 (96 SE2d 257) (1957); *Huntress v. Portwood*, 116 Ga. 351, 355 (42 SE 513) (1902). The designation of "more or less" or the use of "+" and "-" symbols means the same thing — indefinite or approximate acreage; and such designation has no legal value in determining boundaries. See *Mathews v. Logan*, 242 Ga. 69, 70 (247 SE2d 865) (1978); *Bennett*, 212 Ga. at 802; *Huntress*, 116 Ga. at 355. When the quantity of land conveyed is specified as "more or less," it is generally understood that the parties assume the risk of a gain or loss in the quantity estimated. See *Shackelford v. Orris*, 129 Ga. 791, 793-795 (59 SE 772) (1907). Accordingly, McDilda cannot rely on the deeds in his chain of title to claim ownership of an additional 100 acres or so.

In determining the location of the common boundary line, the trial court considered the evidence adduced at trial, walked the land with the parties, and personally observed the blue-marked trees while doing so. Eason testified that the placement of the common boundary line between the Foy and Freeman tracts on his survey corresponded with the placement of the GP blue-painted, marked line. Borem testified that the marked line had been in existence since 1966. Thus, the record contains evidence to support the trial court's factual findings and those findings must be affirmed. See *Kimbrell*, 191 Ga. App. at 545-546.

2. McDilda asserts that the trial court erred in ignoring ancient, natural landmarks, recorded deeds and plats appearing in his chain of title for decades that established the boundary line between his land and Fries's land as the edge of the river swamp and erred by relying instead on unrecorded maps and a GP blue-marked tree line testified to by Fries's surveyor.

A common boundary line may be established by acquiescence. "Acquiescence for seven years by acts or declarations of adjoining landowners shall establish a dividing line." OCGA § 44-4-6. Acquiescence by acts or declarations for seven years in the dividing line is sufficient to establish the true line between the adjoining owners, whether it is the original line or not. *Rogers v. Moore*, 207 Ga. 182, 183-184 (60 SE2d 359) (1950).

Also, an agreement may be executed by placing pins or a fence upon the agreed line where such placement is done with the knowledge and mutual assent of the respective property owners. *Greenway v. Griffith*, 225 Ga. 632, 634-635 (170 SE2d 423) (1969); *Barron v.*

*Chamblee,* 199 Ga. 591, 592-593 (34 SE2d 828) (1945). "An oral agreement establishing a boundary may be duly executed by marking the line with monuments or blazes with the consent of the adjoining landowners." (Citations omitted.) *Cothran v. Burk,* 234 Ga. 460, 462 (216 SE2d 319) (1975).

Here, the trial court cited Borem's testimony to find that "the line had been marked with the knowledge and consent of adjacent landowners more than thirty years before this action was filed." Borem's testimony that the line was already marked in white paint when he began working on the Foy tract in 1972 was unrefuted. The record contains evidence to support the trial court's findings. Therefore, we affirm. See *Page v. Braddy,* 255 Ga. App. 124, 126 (564 SE2d 538) (2002).

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED MARCH 7, 2006 — 

*Dubberly & McGovern, Joseph D. McGovern,* for appellant.
*Callaway, Neville & Brinson, William E. Callaway, Jr., William J. Neville, Jr.,* for appellee.